JULIA BLANCO GÉIGEL, Petitioner, *v*. COURT OF TAX APPEALS, ETC., Respondent.

No. 1307. Argued July 15, 1942.—Decided November 9, 1942.

22

*J. J. Ortiz Alibrán* for petitioner. *George A. Malcolm, Attorney General, M. Rodríguez Ramos, Assistant Attorney General,* and *Eulogio Riera, Deputy Attorney General,* for the Treasurer, intervener.

MR. CHIEF JUSTICE DEL TORO delivered the opinion of the court.

This is a certiorari proceeding instituted pursuant to Act No. 172 of 1941 (Laws of 1941, p. 1038).

On July 6, 1942, Julia Blanco Géigel filed her initial petition entitled "Appeal," praying that a writ of certiorari be issued directed to the Court of Tax Appeals requiring the latter to send up the original record of case No. I-375 in order to review the same, that the decision complained of be set aside, and that another be rendered instead ordering the refund of the tax paid under protest. There were exhibited the receipts pertaining to the payment made on January 9, 1942.

The writ was issued. In compliance therewith, the Court of Tax Appeals sent up the record of case No. I-375. A hearing was held on July 15, 1942, at which the Treasurer of Puerto Rico appeared in opposition to the relief sought by the petitioner.

The latter alleges that upon being served with notice, of a reassessment of her income tax for the year 1940, made by the Treasurer under a subsequent act to which he gave a retroactive effect, she requested the Treasurer, on September 10, 1941, that he annul the tax imposed, such request being refused by him on November 26, 1941; that on December 11, 1941, she appealed from the decision of the Treasurer to the Court of Tax Appeals; that on June 4, 1942, the appeal was set for hearing jointly with nineteen other appeals, and the petitioner moved for a continuance, her motion being argued on June 1, 1942; that although the court reserved its decision and in point of fact postponed the hearing, nevertheless, on June 5, 1942, based on the evidence introduced in the *Ballester* case, it rendered a final decision as if the appeal had been submitted to it on the merits, deciding questions at issue, disclaiming any jurisdiction, upholding the tax, and ordering the collection thereof.

The petitioner further alleges that she requested a reconsideration which was denied by this court, and then enumerates the errors claimed to have been committed by the latter, to wit: in deciding the appeal without the same having been finally submitted; in disclaiming jurisdiction and rendering a decision upholding the tax; in disclaiming jurisdiction on the ground of the failure to file a bond; in not holding that the tax was void on grounds which are specified; in not holding that Acts Nos. 31 and 159 of 1941 (Laws of 1941, pp. 478 and 972) have no retroactive effect, and that in case the contrary must be held, such retroactivity was repealed by Act No. 23 of 1941 (Spec. Ses. Laws, p. 72), and that, in any event, the retroactive application is void; and, lastly, it is urged that if the court took as a basis for its decision the evidence introduced in the *Ballester* case, it incurred in manifest error in weighing the same.

The Treasurer has advanced four grounds of opposition, to wit: (1) that the certiorari proceeding instituted by the

taxpayer is not authorized by Act No. 172 of 1941; (2) that the bond required in order to appeal to the Court of Tax Appeals has not been filed; (3) that no payment under protest was made at the time a review by this Supreme Court was sought; and (4) that the payment effected, although stated to have been made under protest, must be considered as voluntary with all the consequences derived from that fact.

We will take up first the questions raised by the Treasurer.

■ The first is not well-founded. It was definitely decided against the contention of the Treasurer in the case of *Ballester* v. *Court of Tax Appeals,* 60 P.R.R. 749, thus:

"Where the matter in controversy before the Court of Tax Appeals involves a decision of the Treasurer affecting the payment of income taxes within the purview of §4 of Act No. 172 of 1941 (Laws of 1941, p. 1038), the special form of certiorari provided in §5 of said Act is appropriate to bring the case to this Supreme Court."

■ The second is not well-founded either, because here no "deficiency" is involved and it is only in a case of deficiency that the law requires that a bond be filed in order to appeal from the decision of the Treasurer to the Court of Tax Appeals.

Since the legal situation presented by the facts of this case on this point is entirely similar to the one which arose in the *Ballester* case, *supra,* it seems advisable to transcribe at least a portion of the reasoning set forth in the latter case.

There, speaking for the court, Mr. Justice Snyder said:

"The situation here is unique. Our attention has not been called to any authorities squarely in point. The traditional deficiency comes into being, as already noted, by virtue of an examination of the taxpayer's return and a determination by the Treasurer that the taxpayer *at the time he made the return* owed an income tax larger, *under then existing law,* than he had reported and paid. See *Veeder*

v. *Commissioner of Internal Revenue*, 36 Fed. (2) 342, 343 (C.C.A. 7th Circ. 1929).

"Certainly there was not, therefore, a deficiency here in the usual sense. The Treasurer has not questioned the correctness of the returns of the petitioner and his wife as of the date they were filed. The additional tax now claimed became due for the first time *after* these returns had been filed, by virtue of Acts Nos. 31 and 159, Laws of Puerto Rico, 1941, which provided in terms that their provisions should take effect retroactively as of January 1, 1940. The Treasurer himself in the "Notice and Demand" calls it a *new* tax, instead of a tax which the petitioner and his wife should have and did not pay at the time they made their returns on March 15, 1941." *Ballester* v. *Court of Tax Appeals*, 60 P.R.R. 749.

 In support of the third question, namely, that in order to appeal to this Supreme Court from a decision of the Court of Tax Appeals it is necessary to attach to the notice of appeal a receipt setting forth the part of the tax which has been paid under protest, without which requirement this court shall have no jurisdiction, there is invoked §76 (*a*) of Act No. 74 of August 6, 1925, as amended by Act No. 23 of November 21, 1941 (Spec. Sess. Laws, p. 72), which in its pertinent part reads as follows:

"Whenever a taxpayer should not agree with a deficiency or part of a deficiency determined by the Court of Tax Appeals of Puerto Rico under Section 57 (*b*) of this Act, he shall be obliged, nevertheless, to pay it in full, and if he should desire to appeal to the Supreme Court of Puerto Rico in the manner provided by law, in making the payment he shall protest of the part of the deficiency with which he does not agree and he shall request the collector or official making the collection to endorse his protest on his receipt, specifically setting forth the part of the tax which is paid under protest, and said receipt, or a certified (copy) thereof, shall form part of his appeal to the Supreme Court, without which requirement the said court shall not have jurisdiction. . . ."

As may be seen, the act refers only to deficiencies just as it does in §57(*a*) thereof which was construed in the *Ballester* case, *supra*.

No deficiency being involved, it is clear that the legal provision relied on is inapplicable, and since no other provision has been cited—nor have we been able to find any—which would require a prior payment under protest, we must hold that such requisite is not necessary in cases of this kind, where administrative decisions, not deficiencies, are dealt with, as was decided in the *Ballester* case, *supra,* from the syllabus of which we quote as follows:

"The action of the Treasurer in determinig the additional tax under Income Tax Act, as amended by Acts Nos. 31 and 159 of 1941 (Laws of 1941, pp. 478 and 972), and in serving taxpayers with the "Notice and Demand" herein, calling on them to pay such tax, is not a determination of a deficiency pursuant to §57 (a) of said Act as amended, but an "administrative decision" within the meaning of §4 of Act No. 172 of 1941 (Laws of 1941, p. 1038) reviewable thereunder by the Court of Tax Appeals."

Therefore, the Treasurer is also not correct as to the third question raised by him.

Now, it having been decided that the proceeding herein lies without the necessity of first paying the tax under protest, what was the effect of the payment under protest made by the taxpayer on January 9, 1942, after she had appealed on December 11, 1941, from the decision of the Terasurer to the Court of Tax Appeals?

It is a general rule that moneys voluntarily paid into the Public Treasury can not be recovered in a judicial proceeding as a matter of right. Must the payment herein be considered as voluntary? Was the more statement of the protest sufficient to prevent it from being so considered? Let us see.

On April 7, 1905, this court, in the case of *Guerra v. Treasurer of Porto Rico,* 8 P.R.R. 280, held, to quote from the syllabus, as follows:

"The payment of taxes by a taxpayer who is not under duress either as to his person or his property should be considered voluntary.

"So that the taxpayer may protect his rights or recover amounts paid for taxes illegally assessed against his property, he should wait before making the payment until the moment when he sees himself threatened with a sale of his property, and then make the payment under protest, or take the necessary measures to prevent the sale.

"The sums which voluntarily or inadvertently and without protest of any kind, have been paid to the Treasurer as taxes and under a mistaken claim of right, cannot be recovered in judicial proceedings but by action of the legislature."

In the course of the opinion of the court, which was delivered by Mr. Justice MacLeary, the above conclusions are supported by the following reasoning:

"We will now glance at the second preliminary proposition advanced by the appellant, that the taxpayers are cut off from their application to the courts for relief in this case because they have paid the taxes assessed on the lands and cannot recover money voluntarily paid into the Treasury of the Island. To this the appellees reply that although they have paid the tax regularly their application made to the Treasurer on the 8th of May, 1901, was in the nature of a protest, made before the law went into effect, and must be considered as such.

"Inasmuch as the exemption claimed is for ten years, and does not expire for a year or two yet to come, there must be some taxes remainig unpaid, and as to these at least the taxpayers have a right to object in a proper manner. But as the petition seeks to recover back the sums claimed to have been paid in excess of $18.60 per annum, we may examine the force necessary to be given to the proposition laid before us by the attorney for the Island.

"In the discussion the eminent counsel representing the taxpayers in substance says:

" 'Reference is made by counsel for the Government to the views of a so-called eminent legal writer on the matter of voluntary payments. These propositions lack logical soundness and are not consonant with exact justice.'

"Let us hear the text-book speak for itself. In regard to this question of voluntary payments Judge Cooley, in his work on taxation, states the law as follows:

" 'That a tax voluntarily paid cannot be recovered back the authorities are generally agreed. And it is immaterial in such a case that the tax has been illegally laid, or even that the law under

which it was laid was unconstitutional. The principle is an ancient one in the common law, and is of general applications. Every man is supposed to know the law, and if he voluntarily makes a payment which the law would not compel him to make, he cannot afterwards assign his ignorance of the law as the reason why the State should furnish him with legal remedies to recover it back. Especially is this the case when the officer receiving the money, who is chargeable with no more knowledge of the law than the party making payment, is not put on his guard by any warning or protest, and the money is paid over to the use of the public in apparent acquiescence in the justice of the exaction.

" 'Mistake of fact can scarcely exist in such a case except in connection with negligence; as the illegalities which render such a demand a nullity must appear from the records, and the taxpayer is just as much bound to inform himself what the records show, or do not show, as are the public authorities. The rule of law is a rule of sound public policy also; it is a rule of quiet as well as of good faith, and precludes the courts being occupied in undoing the arrangements of parties which they have voluntarily made, and into which they have not been drawn by fraud or accident, or by any excusable ignorance of their legal rights and liabilities.

" 'All payments are supposed to be voluntary until the contrary is made to appear. Nor is the mere fact that a tax is paid unwillingly, or with complaint, of any legal importance, but there must be in the case some degree of compulsion to which the taxpayer submits at the time, but with notification of some sort equivalent to reservation of rights. It has been said in one case that "taxes illegally recovered may always be recovered back if the collector understands from the payer that the tax is regarded as illegal and that suit will be instituted to compel the refunding," but it has been repeatedly held that a mere protest, when payment was not made to save arrest or the seizure or sale of goods, or in submission to process that might immediately have been enforced, would not relieve the payment of its presumed voluntary character. In some cases it is held that a payment made only to release lands from the lien of a tax, or to prevent a sale of lands, or to redeem lands from a sale actually made, will not be held a payment under compulsion, and the party paying cannot reclaim it; but this is not universally assented to; and it seems reasonable that the rule should be restricted to cases in which if sale were made, fatal defects would appear on the face of the proceedings. A party ought not to be exposed to any more

risks or loss in relieving his lands of an apparent cloud upon title than in protecting his goods against an illegal sale.

" 'When a voluntary payment is spoken of, the qualifying word is not used in its ordinary sense, and many payments are held to be voluntary which are made unwillingly and only as a choice of evils or of risks. Thus, a payment has been held to be voluntary which the owner made to save the property from being sold, as he supposed, when the collector was actually assuming to proceed to sale, but with an authority void on its face, and without possession or control of the property. A like ruling has been made when the officer threatened to sell property for a tax not then delinquent, having at the time no power to carry out his threat. So where a court without authority made an order for the payment of a tax, and payment was made accordingly, the party under such circumstances being under no legal compulsion—the payment was held voluntary. So where one of the days fixed for the sale of his property for the illegal tax proposed to make payment on the next day if the sale should be postponed, and postponement was had and payment made as proposed, this was held a voluntary payment. And it has been said in some cases, that when it is sought to recover back a payment as having been made under compulsion, it should be made to appear that payment was made to release either person or property from the power of the officer. And this may be said to express the general sense of the authorities.

" 'Statutes in some States have changed the rule somewhat and have allowed a recovery in all cases of illegal tax, provided that at the time of payment formal protest was made as the statutes prescribe. In respect to such statutes it is only necessary to say that a party relying upon them must be careful to bring his case within their provisions.' (Cooley on Taxation, pp. 809, 810, 811, 812, and 813.)

" * * * * * * *

"In our opinion the law as laid down by Judge Cooley correctly settles the question that, in so far as the recovery of any moneys already paid into the Treasury is concerned, the taxpayers have not taken the proper measures for their own protection. The payments made by them must be considered as voluntary. The taxpayers were under no sort of duress either as to their persons or their property. They should have waited before making payment until a sale of their property was threatened when they, to prevent such a sale, could have made payment of the taxes under protest,

or have sought for an injunction preventing a sale for the taxes claimed to be illegal, and all the matters which are brought to issue in this suit could have been there decided. When money has been inadvertently paid to the Treasury, under a mistaken claim of right, voluntarily and without protest, resort must be had to the Legislature to secure a repayment, and not to the courts, who have thus lost jurisdiction over the subject-matter.'' *Guerra* v. *Treasurer of Porto Rico*, 8 P.R.R. 280, 304–307, 308.

Recently in the case of *Oliver* v. *Treasurer*, 58 P.R.R. 65, this court speaking through Mr. Justice Travieso said:

''In the case at bar the heirs were notified of the assessment and computation on the first of March, 1939. That assessment and that computation could not be final until the period of 30 days which Section 7 grants to the heirs to appeal to the Board had elapsed. Once said appeal had been filed the Treasurer could not request the payment of the tax before the Board of Review and Equalization rendered its decision. After said decision had been rendered, the Treasurer could request the payment. And then the only remedy of the heirs would be to pay under protest and resort to the courts to recover the amounts so paid. The payment made at the moment and in the manner in which it was made in the instant case is a premature and voluntary payment which prevents the heirs from appealing to the Board.''

The payment affected by the taxpayer on January 9, 1942, when she had already appealed to the Court of Tax Appeals, was not one made under compulsion. She was not under any threat of immediate collection. Her case was pending consideration and decision by that court and she could have waited until it had been decided in accordance with the law before taking final action. In these circumstances, the payment made by her must be considered as voluntary with all the consequences which that fact carries with it, to wit: that she herself, by her own conduct, abandoned her claim.

The foregoing conclusion may perhaps seem contrary to reality and unjust, but such is the rule settled by the decisions in the course of time. At most, there is involved a mistake of law, and it is well-known that mistakes of that

kind afford no basis for the recovery of payments not due. See *Quiñones* v. *Industrial Commission,* 60 P.R.R. 434.

It must be held that a recovery of the tax paid herein does not lie, and the record sent up must be returned to the Court of Tax Appeals.

*J. J. Ortiz Alibrán* for petitioner. *George A. Malcolm, Attorney General, M. Rodríguez Ramos, Assistant Attorney General,* and *Eulogio Riera, Deputy Attorney General,* for the Treasurer, intervener.

